DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

# STATE OF NEW JERSEY.

MARCH TERM, 1881.

---

### HART MOORE v. STATE.

A statute which purports to authorize the prosecution, trial and punishment of a person for an offence previously committed, and as to which all prosecution, trial and punishment were, at its passage, already barred according to pre-existing statutes of limitation, is unconstitutional and void.

---

On error to the Supreme Court.

For statement of case, briefs and opinion of Supreme Court, see 13 *Vroom, p.* 208.

For the plaintiff in error, *A. V. Schenck.*

For the state, *C. T. Cowenhoven,* prosecutor of the pleas of Middlesex county.

The opinion of the court was delivered by

DIXON, J. An act passed March 18th, 1796, (*Pat. L.,*

*p.* 208,) entitled "An act for the punishment of crimes," provided in section 73, that no person should be prosecuted, tried or punished for any offence not punishable with death, unless the indictment for the same should be found within two years from the time of committing the offence. This law continued in force, without change, until March 14th, 1879, when a proviso was added to the effect that, for a certain class of offences, a person may be prosecuted, tried and punished "where the indictment has been or may be found within five years from the time of committing the offence." *Pamph. L.* 1879, *p.* 183.

In September, 1879, the plaintiff in error was indicted in the Middlesex Oyer for an offence of the class last mentioned, and upon his trial, it appeared that his misdemeanor was committed more than two years before March 14th, 1879. He therefore insisted upon an acquittal under the statute of 1796, but the defence was overruled and he was convicted. The conviction having been affirmed by the Supreme Court, is now before this court, and the question presented by the record is, whether the defence set up at the trial is valid in law.

If the act of 1879 reached offences which, at the time of its passage, had become dispunishable by force of the law of 1796, then the judgment below is legal, otherwise not.

Upon the trial and in argument here, the question was treated as depending solely on the power of the legislature. It was conceded that the language and purpose of the amendment of 1879 embraced the plaintiff's case, but it was denied that at so late a date a valid law could be passed to punish his crime. We will dispose of the case upon the question thus presented.

The plaintiff's first position is, that by the lapse of two years he acquired a vested right not to be prosecuted or punished for his offence, which the legislature could not take away.

In considering this position, an analogy which is obviously suggested, is that of statutes for the limitation of civil actions.

It is well settled that such laws usually relate to the remedy and not directly to the right. They are not to be considered as elements entering into contracts, for, it is said, parties do not look forward to a breach of their bargains, but to the performance. *Ogden* v. *Saunders*, 12 *Wheat.* 213; *Don* v. *Lippmann*, 5 *Cl. & Fin.* 1.

Hence, in the United States, it is held that a law passed subsequently to a contract, and changing the period of limitation, is not necessarily a law impairing the obligation of the contract, (3 *Pars. on Cont.* 557,) and, ordinarily, courts disregard the limitation fixed in the place of the contract or tort, and enforce only that of the *lex fori*. *Gulick* v. *Loder*, 1 *Green* 68; *Townsend* v. *Jemison*, 9 *How* 407.

But, since it is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, (3 *Black. Com.* 23,) it follows that where the remedy by action is tolled, the right also is legally extinguished, so far forth as that remedy was necessary for its enforcement.

Usually the bar of a statute limiting transitory actions is said not to extinguish the right, because such actions may be brought anywhere, while the statute can have no effect beyond the territory of the sovereign that enacted it; therefore, the right remains to support such action wherever the *lex fori* will permit it to be brought. But, even under these statutes, if the subject matter of an action and the opposing claimants of the right have continued within the same jurisdiction until the statutory term has expired, the title is transferred to him in whose favor the bar exists, and that title will be recognized and upheld in the tribunals of other states, as well. *Newby's Adm'rs* v. *Blakey*, 3 *H. & M.* 57; *Brent* v. *Chapman*, 5 *Cranch* 358; *Shelby* v. *Guy*, 11 *Wheat.* 361; *Thompson* v. *Caldwell*, 3 *Lit.* (*Ky.*) 137; *Story's Conf. of Laws*, § 582 *b; Huber* v. *Steiner*, 2 *Bing. N. C.* 202; *Don* v. *Lippmann*, 5 *Cl. & Fin.* 1.

In regard to local actions, the bar of the local statute extinguishes the right, so far as the suit prohibited is the legal

means of vindicating the right. Thus, in England certain possessory actions existed for enforcing the right to possession of lands; when these actions had become barred, the *right* of possession was transferred to him that before had possession only, and the former owner had the mere right of property. 3 *Black. Com.* 194; *Taylor* v. *Horde*, 1 *Burr.* 60, 119. But when, as by a Jamaica statute, it was provided that after seven years' possession of land under a deed, the act might be pleaded in bar in *any* suit, claim or demand brought against the possessor by any person whatsoever, then it was decided that the possession was converted into a positive, absolute title against all the world. *Beckford* v. *Wade*, 17 *Ves.* 87.

And it has been repeatedly adjudged that a statute which bars all remedy, gives a perfect title, with all its incidents. *Knox* v. *Cleveland*, 13 *Wis.* 249; *Moore* v. *Luce*, 29 *Penna. St.* 262; *Leffingwell* v. *Warren*, 2 *Black* (*U. S.*) 599; 2 *Wash. Real Prop.* 574; *Cooley's Const. Lim.* 365.

In *Moore* v. *Luce*, Chief Justice Lewis said, "laws never deliberately take away all remedy without an intention to destroy the right. When all remedies are taken away after a specified period of neglect in asserting rights, and when this is done for promoting the best interests of society, the right itself is destroyed." Said Judge Swayne, in *Von Hoffman* v. *City of Quincy*, 4 *Wall.* 535, 552, "without the remedy, the contract may, in the sense of the law, be said not to exist." And Washington, J., in *Green* v. *Biddle*, 8 *Wheat.* 1, 76, "if there be no remedy, the law necessarily presumes a want of right."

Now, in all these classes of cases, the courts have decided, that the rights acquired by reason of these statutes of limitation, whether they were rights of property or simply rights to defeat suits, and whether the suits arose *ex contractu* or *ex delicto*, could not be taken away by the repeal or modification of the law.

In *Wright* v. *Oakley*, 5 *Metc.* 400, 410, Chief Justice Shaw intimated that it might not be proper, in technical strictness, to say that a man had a vested right to plead the statute of

limitations, so that it could not be taken away by an express act of the legislature; but he declined to give such an effect to the statute then before him or definitely to concede that any enactment could so operate. In *Ball* v. *Wyeth*, 99 *Mass.* 338, the court still expresses "grave doubt" of the authority of the legislature to give an action after the bar of the statute is complete. But other tribunals have gone further than the expression of doubts, and have distinctly denied the existence of such authority. In the following cases it was directly adjudged that the legislature had not the power. *Naught* v. *O'Neal*, 1 *Ill.* 36; *Sprecker* v. *Wakeley*, 11 *Wis.* 432; *Parish* v. *Eager*, 15 *Wis.* 532; *Bagg's Appeal*, 43 *Penna. St.* 512; *McKinney* v. *Springer*, 8 *Blackf.* 506; *Stipp* v. *Brown*, 2 *Ind.* 647; *Davis* v. *Minor*, 1 *How.* (*Miss.*) 183; *Woodman* v. *Fulton*, 47 *Miss.* 682; *Martin* v. *Martin*, 35 *Ala.* 560; *Girdner* v. *Stephens*, 1 *Heisk.* 280; *Atkinson* v. *Dunlap*, 50 *Me.* 111; *Ryder* v. *Wilson's Ex'rs*, 12 *Vroom* 9.

This conclusion has usually been grounded upon the general principle that it is not within the appropriate sphere of legislative action to pass laws taking away vested rights without the fault or neglect of their owner; and perhaps, in some states, there was not, at least until recently, any express constitutional prohibition against the exercise of such a power. Nevertheless, that it was forbidden by fundamental principle, is established, (to adopt the language of Chief Justice Kent, in *Dash* v. *Van Kleeck*, 7 *Johns.* 508,) by a " train of authority, declaratory of the common sense and reason of the most civilized states, ancient and modern, sufficient to put it at rest, and to cause not only the judicial, but even the legislative authority to bow with reverence to such a sanction." But, besides, there is, in the bill of rights forming part of the constitution of this state, a declaration, which, I think, plainly implies such an inhibition, viz., "that all men have a natural and inalienable right of enjoying and defending life and liberty, and of acquiring, possessing and protecting property;" for it seems idle to assert, in an instrument designed to indicate and limit the powers of government, that a right is natural and inalien-

able, if it can be destroyed or taken away by the mere will of the legislature.    Moreover, there is now, I apprehend, incorporated in the constitution of the United States, a restriction upon the states which effectually prevents the wielding of such authority.    Article XIV., section 1, of the recent amendments, declares that "no state shall deprive any person of life, liberty or property, without due process of law."    It may be impossible, it certainly would be presumptuous, to attempt to frame a definition of "due process of law," which shall embrace all and only all the cases which a just mind will perceive to be included in it; but if an enactment of the legislature which purports simply to strip a man of his right to protect his property, be such process, then the provision is not of sufficient value to warrant its insertion in the organic law. That such a statute is not "the law of the land" or "due process of law," is clearly averred and maintained in *Davidson* v. *New Orleans*, 96 *U. S.* 97, and in *Maxwell* v. *Goetschius*, 11 *Vroom* 383, and cases there cited.

It thus, then, appears to be settled by numerous decisions in civil causes, that when a right of action is barred by a statute of limitations, it cannot be revived by act of the legislature, and that when such a right is so barred in favor of one having possession of property, (if there be no conflicting jurisdictions,) the possessor becomes the owner of the property, with all the incidents of ownership, and his title cannot be impaired by subsequent legislation.    Whether these decisions rest upon express constitutional declarations, or upon still deeper principles, underlying all popular government, is not so important to the present inquiry as is the fact that the stability of their foundation is assured.

We come now to examine whether the rights and liabilities consequent upon crimes are analogous to those which attend civil injuries, what effect our statute of limitations purports to have upon such consequences, and whether there are as strong reasons as in civil matters for considering that effect permanent.

Before committing any offence, the citizen had a natural

Moore v. State.

and absolute right to life and liberty. By his offence, the state acquired the right to deprive him of life or of liberty to the extent prescribed by the violated law. The citizen remained in possession of life and liberty, but his possession was liable to be disturbed by means of a prosecution to be instituted by the state according to law. His offence, however, was local, and subjected his possessions to impairment only within the jurisdiction whose laws he had broken. In these respects, the relation between the offender and the state corresponds to that between one having the possession of land without the right of possession and one entitled to invade that possession by action at law. In both cases, there is a right of suit which must be pursued, if at all, within and under the laws of a single jurisdiction, and, in both cases, the wrong-doer holds a possession which only such legal prosecution can take away.

In view of this position of things, the statute of limitation declares that no person shall be prosecuted, tried or punished for an offence unless the indictment be found within two years after the crime. This, in effect, enacts that when the specified period shall have arrived, the right of the state to prosecute shall be gone, and the liability of the offender to be punished,— to be deprived of his liberty,—shall cease. Its terms not only strike down the right of action which the state had acquired by the offence, but also remove the flaw which the crime had created in the offender's title to liberty. In this respect, its language goes deeper than statutes barring civil remedies usually do. They expressly take away only the remedy by suit, and that inferentially is held to abate the right which such remedy would enforce, and perfect the title which such remedy would invade; but this statute is aimed directly at the very right which the state has against the offender, the right to punish, at the only liability which the offender has incurred, and declares that this right and this liability are at an end. Corresponding provisions in a statute concerning lands would undoubtedly be held to extinguish every vestige of right in him who had not asserted his claim, and to perfect the title of the possessor. Giving them the same force regard-

ing crimes, they annihilate the state's power to punish, and restore the offender's rights to their original *status*.

The next question is, whether this condition is as permanent and unassailable by subsequent legislation as it would be if it pertained to civil rights and remedies.

If the legislature, by declaring that because of the lapse of time it will withhold all remedies, transfers the property of one citizen to another, so absolutely that no after-enactment can restore it, does the legislature, by declaring that for the same cause its own right to proceed against the life and liberty of the citizen has ceased, obliterate its own claim so absolutely that no after-enactment can restore it? It should seem that he who gave a negative answer to this inquiry ought to furnish cogent reasons for his position. To the common sense, it would appear that the power of the state to waive a forfeiture to itself was at least as complete as its authority to deny remedies to its citizens, and that life and liberty were entitled to a shield as impenetrable as that of property.

But let us see whether the bases upon which the inviolability of property is said to rest, underlie also life and liberty. It is asserted that it is not within the appropriate sphere of legislation to take away vested rights of property without the fault or neglect of their owner; that government exists to guard such rights, not to destroy them. So far as this is true, it is axiomatic; no advocate of free institutions will deny it; none can prove it. I avow the same principle as to life and liberty. But it may be alleged that, in the case in hand, these rights are assailed because of the crime of their possessor. The answer is, that notwithstanding that crime, they had resumed their natural character. And if it be suggested that after the so-called resumption, they still remained subject to a change of legislative purpose as to the state's duty to punish crime, the query then arises, why rights of property acquired under limitation laws, do not also remain subject to a change of legislative purpose as to the state's duty to furnish remedies for private wrongs. The duties are equally obligatory; and we are brought back to the assertion that the rights are alike pro-

tected by fundamental principle, an assertion to be either accepted as an axiom or rejected.

Then, as to express restraints upon the legislature. We have seen that the bill of rights of New Jersey places first among those which are natural and inalienable, that of enjoying and defending life and liberty, and that the federal amendment enumerates these blessings before property, as possessions of which no state shall deprive any person without due process of law. Certainly no inference unfavorable to the claim of the plaintiff in error can be drawn from these provisions. But it is intimated that the prohibition against taking private property for public use without just compensation implies a prohibition against taking such property for private use, even with compensation; and it is urged that as there is no such enactment whence to infer similar protection to life and liberty, therefore such protection is wanting. I cannot think it reasonable to draw such an inference from such premises. The same line of argumentation would lead to the position that, if there were no other express constitutional restraint, life and liberty could be taken away arbitrarily by the legislature, for either public or private convenience, and without any attempt at compensation. Such a conclusion is utterly inadmissible, because utterly repugnant to our ideas of the purposes of the social compact. On the contrary, life and liberty can be taken away by the legislature, never for private convenience, nor ever for public convenience, save in those junctures where the preservation of society is the motive for conceding the power. The personal right needs not to be proved, but the necessity of the public power must be established.

Then if, on the other hand, we regard the sphere in which it is admitted that the state may invade the right of personal security, it will be evident how many other express restraints our constitution has placed upon this power. The only province in which such authority is called into constant or even frequent exercise, is for the detection and punishment of crimes. But in this domain, the presentment or indictment of a grand jury must precede the citizen's being held to

answer, except in matters particularly enumerated; he must have the privilege of the writ of *habeas corpus,* unless in rebellion or invasion the public safety requires its suspension; he is entitled to be released on reasonable bail, save in capital cases; he has the right to a speedy and public trial before an impartial jury, to be informed of the nature and cause of the accusation against him, to be confronted with the state's witnesses, and to have compulsory process for his own, and to have the assistance of counsel in his defence; if acquitted, he cannot be again tried for the same offence; if convicted, no excessive fine or cruel and unusual punishment may be imposed.    Certainly, no such guards are thrown by the organic law around the rights of property, as these with which it protects life and liberty, against the state; and if it can be gathered from that instrument that the legislature cannot take away from the citizen a title or a defence for property which he has acquired under the law, *a fortiori* must it be thence deduced that such a power may not be wielded against life or liberty.

Thus, we conclude that every reason which has pressed courts to ascribe finality to the limitation of civil remedies, when once it has attached, impels this court to predicate the same conclusiveness of the bar against criminal prosecutions. See *Thompson* v. *State,* 54 *Miss.* 740.

Just here it may be proper to notice two objections that are presented against this decision.  One is mentioned in the opinion of the learned Chief Justice in this case before the Supreme Court, to wit, that it seems to run into the absurd for a criminal to assert an indefeasible right as against the legislature, not to be tried or punished for his offence after a specified time, for such a claim, he says, assumes the semblance of an assertion that the criminal act was done in reliance on such an expectation.    Such is the respect entertained for this skilled jurist and logician by the bench and bar of the state, that to dissent from his deliberate conclusions creates in the mind an uneasy apprehension of mistake; but one cannot help seeing that, in making the foregoing statement, he has overlooked

the fact that in civil matters, the indefeasibility of the bar is not made to at all depend upon the notion that the statutory limitation entered into the thoughts of the defendant when doing the act to be defended. This idea is expressly repudiated in the cases, for, if of any force, it would make the statute unchangeable as soon as the prescribed term began to run, a claim which no court has ever sanctioned. It is a defence acquired, not the hope of one, which is indefeasible. Until the fixed period has arrived, the statute is a mere regulation of the remedy, and, like other such regulations, subject to legislative control; but afterwards, it is a defence, not of grace, but of right; not contingent, but absolute and vested; and, like other such defences, not to be taken away by legislative enactment.

The other objection is suggested by Mr. Bishop in his treatise on Statutory Crimes, section 266, to the effect that a criminal statute of limitations simply withholds from the courts jurisdiction over the offence after the specified period, and it is competent for the legislature to revive the old jurisdiction or create a new one, when the prosecution may proceed.

Evidently the same doctrine would upset the uniform train of decisions in civil causes—and moreover, it would be a strained and unnatural interpretation of our act to say that it simply withholds jurisdiction from the courts. Its language is "no person shall be prosecuted, tried or punished." It does not relate to the courts, but to the person accused. The answer which, under it, the defendant must make to an accusation before the tribunal which once had the right to punish him, is, not that the court has no jurisdiction to inquire into his guilt or innocence and pass judgment, but that, after inquiry, the court must pronounce judgment of acquittal. And probably no one would contend that after such judgment, any change in the law could legally subject the defendant to a second prosecution. Yet, I suppose, an acquittal by a court without jurisdiction, is void. *Hawk. Pl. Cr.*, *bk.* 2, *ch.* 35. It cannot be maintained, then, that the act impairs jurisdiction.

We now come to a second position taken by the plaintiff in error, that the statute of 1879, so far as it purports to reach his case, is an *ex post facto* law. If it be, it is expressly prohibited by both state and federal constitutions.

It has already been seen that at the time this act was passed, the plaintiff was, under pre-existing laws, relieved from all liability to punishment for his offence, and if there be now any such legal liability, it is because that liability has been created by the statute in review. The question therefore is, whether a law which creates a liability to. punishment for a preceding offence is an *ex post facto* law.

*Ex post facto* laws are, in a general sense, enactments after the facts to which they relate, and the expression would include both criminal and civil statutes. *Burrill's L. Dic., sub nom.*   In *Den* v. *Goldtrap, Coxe* 272, A. D. 1795, Chief Justice Kinsey, in the Supreme Court, said of a law for the recording of pre-existing mortgages, " this act, strictly speaking, is *ex post facto.*" Not long afterwards, the same court adjudged a statute declaring that in certain cases payments made in continental money should be credited as specie, (*Pat. L., p.* 172,) to be an *ex post facto* law, and as such, unconstitutional, 4 *Halst.* (*Appendix*) 444; and in *State* v. *Parkhurst,* decided in 1802, and reported in the same appendix, Chief Justice Kirkpatrick said that a law depriving a man of one office because of his holding some other office, might, perhaps, be questioned as an *ex post facto* law.   See, also, Justice Johnson's references in appendix, 2 *Peters* 681.

But it has now long been settled that as used in our constitutions, the phrase embraces only retrospective statutes of a criminal or penal character.   To what extent it includes these, is not definitely determined.   It has sometimes been said that at the time of the adoption of the federal constitution, the words had acquired a fixed meaning as a technical term; but a reference to the citations already mentioned shows that this statement is not exactly true, and in *Calder* v. *Bull,* 3 *Dall.* 395, Judge Chase says " the words *ex post facto* law have not any certain meaning attached to them."   Before the constitu-

tion, Blackstone's definition, so called, is the only one referred to as giving the words precision. I think it is doing the illustrious commentator injustice to consider his language as an attempt to define the term. He was speaking of the necessity of having rules *prescribed*, made known, before they became obligatory, and after mentioning one iniquitous practice in this regard, he says " there is still a more unreasonable method than this, which is called making of laws *ex post facto ;* when, after an action (indifferent in itself ) is committed, the legislature, then for the first time, declares it to have been a crime, and inflicts a punishment on the person who has committed it." To me, this appears rather an illustration than a definition. Doubtless, the class he specified was *ex post facto*, and perhaps the most glaring instance of the injustice of such laws, which was the thought he was aiming to present ; but it hardly seems probable that he considered his illustration as embracing all possible cases. However this is, it cannot be disputed that the accuracy of this so-called definition was early denied, and it has never been received as complete ; for a law increasing the punishment of former crimes is as clearly *ex post. facto* as one inflicting. punishment for a previous innocent act.

In *Ex parte Garland*, 4 *Wall.* 333, Mr. Reverdy Johnson, *arguendo*, (*p.* 365,) quotes two other definitions by English writers, viz., that such a law is one " made to meet a particular offence committed," and that it is " a law enacted purposely to take cognizance of an offence already committed." These definitions differ from Blackstone's in the only particular wherein the latter fails to cover the case in hand. They do not regard as essential the innocence of the act for which the penalty is imposed.

Turning now to authorities since the constitution was framed, we first notice the *Federalist ;* but all the light which it affords is in the eighty-fourth number, by Mr. Hamilton, where, however, he merely repeats the illustration of Justice Blackstone. This, therefore, is not a perfect guide.

Next comes the case of *Calder* v. *Bull*, 3 *Dall.* 386, one

cited more frequently than any other. Of this case, it may be remarked that the only question before the court was whether a law of Connecticut granting a new hearing in a civil cause was forbidden as being an *ex post facto* law; and when the court determined that the interdict did not extend to civil statutes it decided the cause. What was said, therefore, by Judge Chase as to the kind of criminal statutes prohibited, was fairly *obiter dictum.* But in the course of his remarks he mentions four classes of laws which he considers *ex post facto* within the words and intention of the constitution, and his classification has often been repeated by judges and text-writers in discussing the subject. Still, it may not be presumptuous to say that doubts may be entertained whether his fourth class does not include cases outside of the prohibition, whether every law that alters the legal rules of evidence and receives different testimony than the law required at the time of the commission of the offence, in order to convict the offender, is an *ex post facto* law. Mr. Bishop declines to assent to it, and Chief Justice Beasley mentions it with a " perhaps," and it is easy to see that it may entrench too far upon legislative control over mere methods of procedure. But it is plain that Judge Chase's classes extend much beyond Blackstone's expression. It seems to me, also, that Judge Chase did not consider his classes as exhaustive, for he closes them with the remark that "all these and *similar* laws are manifestly unjust and oppressive," an allusion, doubtless, to the characteristics by which he had formulated his rules.

The statute in hand is not covered by any of these classes, unless possibly by the fourth, but as that is of questionable propriety, it may be passed by. Looking, however, away from his classification to what he states to have been the motive for and principle sustaining the edict, we find him using language which easily embraces the present case. Among the unrighteous acts of the British Parliament, which moved the framers of this government to set up this restraint, he says, " at other times they inflicted punishment where the party was not by law liable to any punishment;" which means, of

course, not liable by any law in existence before the unjust law itself was passed. This phrase exactly describes the operation of our statute of 1879 upon this plaintiff. The law inflicted punishment upon him who was not, by pre-existing law, liable to any punishment. Again, the judge says, " the plain and obvious meaning and intention of the prohibition is this, that the legislatures of the several states shall not pass laws after a fact done by a subject or citizen, which shall have relation to such fact and shall punish him for having done it." If this be true, then is this law forbidden ; for it was passed after the act done by the plaintiff, and it had relation to such act, and punished him for having done it ? He further says, " the prohibition is an additional bulwark in favor of the personal security of the subject, to protect his person from punishment by legislative acts having a retrospective operation." Then, behind this bulwark, the plaintiff's person must be protected from punishment by this legislative act having a retrospective operation. So, in Calder v. Bull, the judges refer to the constitution of Delaware as prohibiting *ex post facto* laws, in these words : " Retrospective laws punishing offences committed before the existence of such laws, are oppressive and unjust, and ought not to be made." Language could not more completely embrace this statute in its relation to the plaintiff. The words of other state constitutions are not so plainly applicable ; thus, those of Maryland and North Carolina declare " that retrospective laws punishing facts committed before the existence of such laws, *and by them only declared criminal*, are oppressive, unjust and incompatible with liberty : wherefore, no *ex post facto* law ought to be made." One clause in this paragraph prevents the inclusion of the statute now before us in the class thus described, but it is noticeable that the interdict is not limited to that class, but extends to all *ex post facto* laws ; and it is conceded that such are those providing penalties for previous acts which *were criminal under other laws*.

The next indication of the meaning of the phrase is Chief Justice Marshall's justly lauded expression in *Fletcher* v. *Peck*,

6 *Cranch* 138 : "An *ex post facto* law is one which renders an act punishable in a manner in which it was not punishable when it was committed." If this be an exact definition, then an act to change the penalty of murder or treason previously committed, from death to a fine, would be void. But if even Marshall's terse language be as broad as Chancellor Kent declares it is, it includes the present statute, for, he says, it extends to laws passed after the act and affecting a person by way of punishment for that act, either in his person or estate. 1 *Kent's Com.* 409. That is precisely the force ascribed to this law against the plaintiff.

These instances sufficiently exhibit the forms of expression adopted by judges and authors concerning *ex post facto* laws, and from them it is perceived that among mere verbal definitions, some reach the statute now under review and some do not. But all authorities now agree that the constitutional phrase is not to be received in its literal sense, that it does not embrace all *ex post facto* laws, *i. e.*, all laws passed after the occurrences to which they relate, but its meaning is to be ascertained by considering the motives which prompted its adoption and the spirit which it was designed to embody. No one can expect to indicate in advance, *currente calamo*, all the modes in which legislation may antagonize its beneficent purpose, and it must be left for judicial tribunals, actuated by like motives and imbued with the same spirit, to pronounce, in the light of precedent decisions, upon each case as it shall arise. For the present inquiry, judgments already rendered, not *dicta*, seem to me to afford no uncertain guide, and to lead to the conclusion that the determination below was wrong.

There is a line of cases which hold that laws regulating the mode of procedure in the prosecution of antecedent crimes are not *ex post facto*. With such legislation, so long as (to use the language of Judge Cooley, *Const. Lim.*, 272,) it does not dispense with any of those substantial protections with which the existing law surrounds the person accused of crime, no fault can be found. Of this class, I think, are the cases of *Commonwealth* v. *Getchell*, 16 *Pick.* 452, and *Commonwealth*

v. *Mott*, 21 *Pick.* 492, which are cited as supporting the judgment now before us. The legislation in review was to this effect: a statute of 1827 enacted that a person *convicted* of a crime punishable by imprisonment, who had been before *sentenced* to like punishment, should be liable to confinement at hard labor not exceeding seven years, in addition to the penalty prescribed for his later offence, and the prosecution for this additional punishment was to be by a separate information. A statute of 1832 provided that no convict should be sentenced under the prior act, unless he should before have been *twice sentenced* and *twice discharged from prison*. A statute of 1833 repealed that of 1832 and substantially re-enacted that of 1827. The defendant, Getchell, was undergoing his second imprisonment before, during and after the existence of the act of 1832; and the court held that, after its repeal and before his discharge, he was liable to be sentenced to the additional punishment. This was the posture of affairs: when convicted, pending the act of 1827, he at once became liable to the additional prosecution; then the act of 1832 suspended the prosecution until he should have been discharged from prison; then the act of 1833 restored the permission to prosecute at once. The laws of 1832 and 1833 were manifestly mere regulations of the procedure. That of 1832 did not relieve the defendant from liability to prosecution and penalty, but simply stayed the prosecution (and that, in a manner not at all beneficial to him,) until his present imprisonment was ended. In Mott's case, the second offence was committed pending the act of 1827, but he was not convicted of it till after the act of 1833. It was decided that his case was not distinguishable in principle from Getchell's, and it is not evident how it could be. Chief Justice Shaw says that the act of 1832 was to meet cases of two sentences at the same term of court, and relieve them from the act of 1827; and it would have had that effect; for then there would have been liability under the early act by reason of the *first sentence* and *second conviction*, but there never could arise liability under the later act, because there could not be *two discharges* from

prison.   If such a case had come before the court, and as to that the law of 1833 had been held .valid, the decision would have been in point here; but these cases are not.

The following adjudications are, in principle, adverse to the judgment now before us, recognizing the notion that a statute substantially imposing punishment for a previous act which, without the statute, would not be so punishable, is an *ex post facto* law, although it may not be included in the letter of Judge Chase's rules.

In *State* v. *Sneed*, 25 *Tex.* (*supp.*) 66, a law which attempted to remove the bar of the statute of limitations was denounced as *ex post facto*.

*State* v. *Keith*, 63 *N. C.* 140, presented this point : after the prisoner's crime, an act of amnesty was passed, by force of which he was relieved from liability to punishment; subsequently this act was repealed by ordinance of the state convention ; and then the prosecution was instituted.   The court decided that the ordinance was an *ex post facto* law, because it made criminal, (*i. e.*, punishable,) what before the ratification of the ordinance was not so, and took away from the prisoner his vested right to immunity.   Dr. Wharton (*Crim. Pl. & Pr.*, § 316,) borrowing almost the language of the court in *People* v *Lord*, 12 *Hun* 282, says "the statute [of limitations] is not a statute of process, to be scantily and grudingly applied, but an amnesty, declaring that after a certain time oblivion shall be cast over the offence."   On the other hand, it is urged that it is not permissible to consider such a statute as an amnesty or pardon, because these are always granted after the crime, and are intended to absolve the guilty, while that is enacted before the fact and is designed to protect the innocent.   Neither of these grounds of distinction seems to me stable.   It is not the passage of the limitation law, but its maintenance unrepealed for the requisite period after the offence, which creates the amnesty, and its very terms indicate that the guilty, and not the innocent, were those the legislator had in view; it begins to run only on the "committing of the offence."   True, an innocent man may set it up, but so he

may a general amnesty. It is not inapt, then, to call the bar of such a statute an amnesty. But name it as you will, at least the act of 1879 purported to do with the plaintiff what the North Carolina ordinance attempted to do with Keith, and for which it was adjudged unconstitutional; it made punishable what before its passage was not so, and took from the plaintiff his vested right to immunity.

In *Hartung* v. *People*, 26 *N. Y.* 167, this was the condition of things: the prisoner had committed murder, been tried, convicted and sentenced to death, while the law provided that death should be the penalty, and the sentence of the court the mode of fixing the time for its infliction. Then she had sued out a writ of error carrying the judgment to the Court of Appeals, and pending that writ the former law had been repealed, and a law enacted to the effect that all persons then under sentence of death should be confined at hard labor in the state prison for one year, and thereafter until the governor should issue his warrant for the execution of the sentence. On this writ of error, the Court of Appeals had decided that this change in the law rendered the judgment below erroneous, and had reversed it and ordered a new trial (22 *N. Y.* 95.) Afterwards a law was passed restoring the statute as it existed when the murder was committed. The court decided that as to her this last act was an *ex post facto* law and unconstitutional. It is true, that, in reasoning upon the subject, the court adverts to the fact that before the passage of the law, the defendant had been adjudged to be dispunishable for murder under laws then existing; but manifestly it was the fact that she had become dispunishable, and not the existence of any verdict or judgment, that gave this character to the subsequent law. The verdict or judgment might protect her from legislative reach because of some other 'fundamental principle, but interference with judicial proceedings has never been regarded as of the essence of *ex post facto* laws. It is by their effect upon the *status* of individuals that they are to be so characterized. And such was the view of the court; for Chief Justice Denio, in delivering the opinion

said, " by the repeal of the provisions of the Revised Statutes, and the trial and acquittal of the offender while such repealing law was in force, the act of the prisoner, though not innocent in a moral sense, would be dispunishable. A legislative act restoring the repealed law would have precisely the same effect as though the offence had not been punishable originally, but had been made so for the first time by the restoring act. Such a law would be within the spirit of this constitutional prohibition, and would, in my opinion, be void."

In the same category is the case in hand. The law prescribing punishment for the plaintiff's crime, had not indeed been repealed, but as to that offence it had expired, and so was as if repealed (*Yeaton* v. *United States*, 5 *Cranch* 281); hence it was the same thing, with regard to that transaction, as if it had never existed. *Surtees* v. *Ellison*, 4 *M. & R.* 586; *Kay* v. *Goodwin*, 6 *Bing.* 582; *Potter's Dwar. on Stat.* 160. The sanction of the law was dead. The plaintiff's act stood as though it had been perpetrated in the face of a statute which forbade it, but declared that he should not be prosecuted, tried or punished for doing it. Then the act of 1879, restoring the expired law, had precisely the same effect as though the offence had not been punishable originally, but had been made so for the first time by the restoring act. Such a law is within the spirit of the constitutional prohibition.

In *In re Murphy*, 1 *Woolw.* 141, the defendant had been convicted by court-martial, at a time when he was subject to trial only in civil tribunals. Afterwards congress passed a law to validate such conviction. On *habeas corpus*, Justice Miller said: " If this act be valid, the prisoner must be detained. It is evidently intended to make two provisions, one, to validate the punishment of offenders which would otherwise be illegal. * * * So far as the first point is concerned, the law is unconstitutional; undoubtedly so. No clearer case of an *ex post facto* law can be framed. * * * The prisoner, up to the time of the passage of this law, was certainly illegally imprisoned, because tried by and held under the sentence of a

court which had no jurisdiction of his person or of his offence. If he be remanded, it will be under an act passed subsequent to his offence, and even to his conviction. Can any law be more clearly *ex post facto?*"

So with the case of this plaintiff. It is sought to legalize his punishment, which would otherwise be illegal, by an act passed subsequent to his offence, without which he was free from lawful prosecution, not only in some courts, but in all courts and by any methods. Such a statute is void.

In addition to these decisions, the opinion of Mr. Wharton is well worthy of being cited. In a note to section 316 of Criminal Pleading and Practice, he does not hesitate to say that an act of congress which undertakes to authorize prosecutions for offences which prior statutes of limitation have canceled, is an *ex post·facto* law, and hence void.

The impolicy of keeping crimes, not of the deepest dye; punishable during the whole life of the offender, is sufficiently indicated by the common usage of civilized nations in fixing a period for the limitation of criminal prosecutions. The beneficent aims of such a usage are thwarted if the limitation be not absolute and irrevocable. The injustice and oppression of laws repealing the limitation, after persons have once relied upon its finality, must be apparent to all. The innocent, conscious of acts which, when only partially disclosed, may seem criminal, preserve the evidence of the whole truth until time has established the legal proof of innocence by barring prosecution. Then their vigilance relaxes and their evidence is lost. What more unjust, than that now the legislature should abate their protection, and leave them to the hazard of half-discovered facts? A guilty man, not wholly lost to honor and to hope, passes through the statutory period after his single offence, cowed by the constant dread of detection and disgrace. Then, relieved from danger, he returns to the path of rectitude, forms respectable associations, and gathers around him those who repose in his virtue and depend upon his fair fame. Now the law changes; the detective drags to light his long-buried crime; and innocent and guilty alike are over-

whelmed in a common ruin. It was of grace that remission was granted ; it is the spirit of injustice and oppression that withdraws it. To forbid the exercise of such power, the mandate of the constitution stands.

There is another aspect of this case, not presented upon the argument, but in which some members of the court think it appears that the judgment below is wrong.

Statutes extending periods of limitation are not to be construed as designed to affect cases where the bar has already attached, unless no other reasonable interpretation can be applied. *Angell on Lim.*, § 22, *note*.

The act of 1879 is doubtless retrospective, but every word of it, save two, may have effect, and yet reach only past offences still subject to punishment when it was enacted. These two words make the prosecution legal where " the indictment *has been* found within five years from the time of committing the offence." This provision is nugatory, unless it was meant to legalize indictments theretofore found more than two years after the crime. But this language does not reach the plaintiff's case ; his indictment was found after the statute ; and, under the rule, rigorously enforced, the law may be considered as not legalizing his prosecution. If necessary to avoid injustice, I would so interpret it.

The judgment below should be reversed.

RUNYON, CHANCELLOR. By the one hundred and thirteenth section of the act regulating proceedings in criminal cases, (*Rev.*, *p.* 288, 289,) it is provided that no person or persons shall be prosecuted, tried or punished for an offence not punishable with death, unless the indictment shall be found within two years from the time of committing the offence or incurring the fine or forfeiture, provided that nothing contained in the act shall extend to any person or persons fleeing from justice. The Revision was approved March 27th, 1874. By a supplement approved March 14th, 1879, (*Pamph. L.*, *pp.* 183, 184,) the section was amended by adding the following further proviso : " That any person holding or hav-

ing held, or who may hereafter hold, any public office or employment, or exercise the functions of such office or employment, either under this state, or any county, city, borough, town or township therein, whether elective or appointive, may be prosecuted, tried and punished for any fraud, malfeasance or other misconduct committed whilst in such office or employment, where the indictment has been or may be found within five years from the time of committing the offence."

The plaintiff in error was convicted of an offence not punishable with death. It was committed more than two years before the passage of the amendment, and under the law as it stood before the amendment, it was barred, because no indictment had been found against him within the two years. The offence, however, was such as is specified in the amendment, and was committed by him while holding such an office as therein mentioned.

The question presented for decision is, whether the legislation of 1879 is, as to him, constitutional. The prohibition against *ex post facto* laws contained in the constitution of the United States and the constitution of this state is aimed at and was designed to shield the citizen against the arbitrary power of the legislature. The evil apprehended, and against which it was intended to guard, was the oppression of the citizen by means of legislation the effect of which is to render him amenable to criminal punishment for past transactions, to which he would not have been liable except by means of the legislation.

That in ascertaining what legislation is within the prohibition we are not to be confined to any definition less extensive than the evil sought to be guarded against, is manifest from the course of judicial interpretation. The definition given by Blackstone, for example, falls far short of the description given by Justice Chase in *Calder* v. *Bull,* 3 *Dall.* 386, which has ever since that decision been regarded as within the limits of true interpretation. It is conceded that that description or explanation did not amplify the meaning of the term, but merely expressed it more fully than it had been previously

formally enunciated, and, from the fact that that more ample description has been accepted, the deduction is inevitable that in construing the provision, substance is mainly to be regarded. It follows that where the enactment, in whatever guise legislative ingenuity or subtlety may present it, inflicts the substantial injury, and does the essential wrong which the constitution sought to guard against, a true interpretation will hold it to be within the prohibition. Manifestly we are not to be circumscribed to the cases in which the legislature makes a crime of that which previously was no crime at all ; for it is conceded that the prohibition is to be regarded as extending to even such legislation as merely deprives a party, guilty of an act which was a crime by law when it was done, of the opportunity of escape from the declared punishment which the law regulating the proof afforded him when the offence was committed ; as by reducing the number of witnesses essential to warrant a conviction, or rendering competent, as witnesses, persons who by law were then incompetent. Such legislation deprives the offender of no protection to which he is morally entitled. It merely makes conviction of the crime possible where, perhaps, before it was impossible. It deprives him of a possible avenue of escape. The offence was a crime, when committed, and still continues to be so. And such interpretation is in accordance with true principle. Mr. Burrill, in his Law Dictionary, defines an *ex post facto* law to be one which operates by after-enactments. *Law Dict.* 447. Judge Chase, in Calder *v.* Bull, says the plain and obvious meaning and intention of the prohibition is that the legislature shall not pass laws after a fact done by a citizen which shall have relation to such fact and punish him for having done it. "With a manly nation," says Dr. Lieber, "let everything that is in favor of power be closely construed ; everything in favor of the security of the citizen and the protection of the individual, comprehensively, for the simple reason that power is power, which is able to take care of itself, and tends by its nature to increase, while the citizen wants protection." *Lieber's Leg. & Pol. Her.* 178.

In the case in hand, on the 14th of March, 1879, the date of the approval of the act of the legislature under consideration, the offence of which Moore was convicted had become barred by statute. It was therefore, by virtue of existing legislative enactment, at that date wholly dispunishable, and he was as free from all criminal consequences of it as if it had never been committed. Without new legislation, he could not have been punished for it. He had acquired immunity, and the legal limitation was his protection and his sure defence. After he had thus, by operation of the statute, been discharged from all criminal liability, the legislature passed the act now under judicial scrutiny, which provides that persons, of whom he was in fact one, who had held certain offices, might be prosecuted, tried and punished for the offence, where the indictment was found, in five years from the time of committing the offence; thus extending the limitation for three years. This act, then, in his case, created a liability to punishment for a past offence, from all criminal consequences of which he stood discharged. While it did not make a crime of that which previously was no crime, it made that punishable as a crime which was not so punishable when it was passed, and which, without it, was not punishable at all. In effect, it made that a crime which had ceased to be such, legally. That such legislation is reprehensible and extremely dangerous admits of no manner of question. In my judgment, it is, as to all persons whose offences were dispunishable by reason of the limitation when the act was passed, within the constitutional prohibition, for it violates the essential principle and does the substantial injury against which the prohibition is directed.

It is also liable to the objection that it is in violation of the vested rights of all such persons. "Every law," says Judge Cooley, using the language of Judge Chase in Calder v. Bull, "that takes away or impairs rights vested agreeably to existing laws, is retrospective, and is generally unjust, and may be oppressive; and there is a good general rule that a law should have no retrospect." Const. Lim. 265. It has been held in

this state that where a right of action has become barred
under a statute of limitations, the statutory defence is a
vested right that cannot be impaired by subsequent legisla-
tion. *Ryder* v. *Wilson's Ex'r*, 12 *Vroom* 9. Though the
adjudication there was upon a claim of civil right merely, it
seems to follow that a like defence in reference to a criminal
offence should no less be regarded as a vested right. It would
seem clear that, if the citizen may confidently rely for the pro-
tection of his property on the law of limitation, he should be
equally able to do so where his life or liberty and reputation
as well as his estate, are involved in a criminal charge. It
matters not that the theory on which the protection from con-
tracts by limitation may be rested—that the existing statute
of limitation is to be regarded as constituting part of the con-
tract—is inapplicable to the claim of protection under a limi-
tation as to criminal offence; for it is an abundantly sufficient
reason why the protection of the latter should be held sacred
that the legislature has the power to declare the immunity,
and has done so, and that the offender has by its terms be-
come entitled to it. Moreover, in Ryder *v.* Wilson's Ex'r,
which was a case where an executor claimed the benefit of an
existing statute of limitation in no wise connected with con-
tract, but protecting him from suit for a debt of his testator,
the decision was rested on the broad basis of vested right to
the benefit of the enactment merely, on the ground that while
it existed, the executor had become entitled to it. And it was
held that he could not be deprived of it by subsequent legis-
lation, although it was a mere positive regulation designed to
facilitate executors and administrators in the settlement of
estates.

The legislature cannot deprive an offender of the benefit of
the immunity of an amnesty, and it seems equally clear that
on the same principle it cannot deprive him of the benefit of
a limitation after he has become entitled to it by the expira-
tion of the period limited. The distinction which may be
drawn between the two legislative acts does not constitute an
essential difference in the application of the principle. An

amnesty extends the grace of pardon to criminals before conviction. It in effect declares that the government will treat them as if the offence had never been committed, and that the offender shall be free from the legal consequences of his crime. An act of limitation declares that the offender shall not be punished unless the state prosecutes him within a limited period. When the period has elapsed, the unindicted offender is, to all intents and purposes, amnestied by the limitation. In both cases, whether of amnesty or limitation, the legislature recognizes the fact that a crime has been committed, and of grace declares immunity to the offender. Both rest on the same foundation—legislative grace to offenders—and it matters not, in principle, whether the act of grace be extended in the one way or the other; in either case the offender is entitled to hold the benefit of it.

The judgment of the Supreme Court should be reversed.

VAN SYCKEL, J., (dissenting.) Section 113 of the act respecting criminal procedure, provides that " no person shall be prosecuted, tried or punished for any offence not punishable with death, unless the indictment shall be found within two years from the time of the committing of the offence or incurring of the fine or forfeiture aforesaid."

On the 14th of March, 1879, an act was passed providing " that any person holding, or having held or who may hereafter hold any public office or employment, or exercise the functions of such office or employment, either under this state, or any county, city, borough, town or township therein, whether elective or appointive, may be prosecuted, tried and punished for any fraud, malfeasance or other misconduct committed whilst in such office or employment, where the indictment has been or may be found within five years from the time of committing the offence."

The question presented for adjudication is, whether the right to institute the criminal proceeding, which had been barred by lapse of time by force of the prior statute, has been or could be revived by the act of 1879.

1. Does this statute relate to past transactions?

The rule is that a retroactive effect will not be given to legislative acts, unless the intention to make them so can be clearly drawn from the language used.

In this case the intention is expressed. The law, in terms, applies "to any person holding, having held, or who may hereafter hold any public office;" the present officer, the person who has in the past been an officer, and the person who shall in the future be an officer. It also expressly embraces the cases where "the indictment has been or may be found within five years from the time of committing the offence;" that is, to an indictment which has been found before the act passed, as well as to one afterwards found, the only requirement being that it must have been or must be found within five years from the commission of the offence. There is surely nothing obscure, ambiguous or uncertain in this language. It seems too clear for discussion, so clear that the point was not made by the able counsel who argued the case on behalf of the prisoner, either in this court or in the court below.

2. Is the act of 1879 *ex post facto*, within the prohibition of the federal and state constitutions?

What is an *ex post facto* law?

The grounds upon which this fundamental rule rests found expression in the English law at least as early as the days of Lord Coke, who says:

"The king cannot create any offence by his prohibition or proclamation, which was not an offence before, for that was to change the law, and to make an offence which was not, for where there is no law there is no transgression." 12 *Coke* 75.

Blackstone, in 1 *Comm.* 46, thus defines an *ex post facto* law.

"When, after an action (indifferent in itself) is committed, the legislator for the first time declares it to have been a crime, and inflicts a punishment upon the person who has committed it."

Mr. Hamilton, in the *Federalist*, No. 84, says :

" The creation of crimes after the commission of the fact, or in other words, the subjecting of men to punishment for things which when they were done were breaches of no law, and the practice of arbitrary imprisonments, have been in all ages the favorite and most formidable instruments of tyranny."

In *Fletcher* v. *Peck*, 6 *Cranch* 139, Chief Justice Marshall says an *ex post facto* law is one " which renders an act punishable in a manner in which it was not punishable when it was committed ;" a definition commended by Chancellor Kent for its comprehensiveness and precision. 4 *Kent's Com.* 409.

Judge Washington, in *Ogden* v. *Saunders*, 12 *Wheat.* 266 ; Judge Story, in *Watson* v. *Mercer*, 8 *Pet.* 110 ; Judge Field, in *Cummings* v. *Missouri*, 4 *Wall.* 326, and Judge Campbell, in *Carpenter* v. *Commonwealth of Pennsylvania*, 17 *How.* 463, unhesitatingly accept this as the true legal definition of this term.

Judge Campbell says : " The debates in the federal convention upon the constitution show that the term ' *ex post facto* ' was understood in a restricted sense relating to criminal cases only, and that the description of Blackstone of such laws was referred to for their meaning. This signification was adopted in this court shortly after its organization, in opinions carefully prepared, and has been repeatedly announced since that time."

Judge Chase discussed this question in *Calder* v. *Bull*, 3 *Dall.* 386, soon after the adoption of the federal constitution. After using some general expressions, which have been cited to prove that he gave to the term " *ex post facto*" a meaning wide enough to comprehend the case in hand, he negatives such an idea by saying : " I will state what laws I consider *ex post facto* within the words and intent of the prohibition.

" *First.* Every law that makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action.

"*Second.* Every law that aggravates a crime or makes it greater than it was when committed.

"*Third.* Every law that changes the punishment and inflicts a greater punishment than the law annexed to the crime when committed.

"*Fourth.* Every law that alters the legal rules of evidence, and receives less or different testimony than the law required at the time of the commission of the offence, in order to convict the offender."

This definition simply changes the form of stating the rule as given by Blackstone and Marshall, and does not alter the substance. It embraces any law by which punishment may be imposed for a crime, not so punishable as a crime when committed.

Any enactment which aggravates a crime or increases its punishment, punishes to the extent of the added severity what was not punishable as a crime when done.

Likewise, by the alteration of the rules of evidence, in requiring less testimony to convict, a man may be punished for an act which could not have been punished as a crime when he did it.

This would conspicuously be the result of an after-law requiring but one witness to convict of treason or perjury, or enacting that the prisoner should be presumed to be guilty until he proved his innocence.

Each of the four members of Judge Chase's definition, in order to give a law the *ex post facto* quality, makes it essential that the change in the law shall relate to the time when the offence was committed.

That he did not intend to enlarge the definition of this term beyond the well-defined limit that it must make that criminal or punishable which was not punishable as a crime, when the alleged criminal act was done, is evinced by his subsequent remarks :

"The expressions '*ex post facto*' are technical, they had been in use long before the revolution, and had acquired an appropriate meaning by legislators, lawyers and authors.

The celebrated and judicious Sir William Blackstone, in his Commentaries, considers *ex post facto* law precisely in the same light I have done. His opinion is confirmed by his successor, Mr. Woodeson, and by the author of the *Federalist*, whom I esteem superior to both for his extensive and accurate knowledge of the true principles of government."

It is inexact, therefore, to charge Judge Chase with an intention to amplify the signification of this technical term. As the basis of an argument to justify further amplification, it illustrates the danger of introducing into the law any uncertainty as to the meaning of a phrase which has been so often construed by our courts.

Thus, we have at that early day, a declaration of the highest federal court, approving the definition of this term as given by Mr. Blackstone and accepted by Mr. Hamilton. Almost every judge, in the cases cited, has declared that when these words were incorporated in the federal constitution, they were technical words, having a fixed, definite meaning.

The clause has received a uniform exposition from that day to this, supported by the greatest names that have adorned the bench of our country. Marshall, Kent, Washington, Story, Field and Chase agree in defining what acceptation shall be given to it. To these may be added Chief Justice Shaw, Judge Denio and many other eminent jurists. *Jacquins* v. *Commonwealth*, 9 *Cush.* 279; *Hartung* v. *People*, 22 *N. Y.* 95.

In this unbroken line of judicial decision, there is not the slightest intimation that a law is *ex post facto* which does not tend to impose some punishment, which could not have been adjudged at the time the crime was committed. The vice consists in making the after-law relate to the time when the offence was committed.

After the most careful research I have found no adjudged case which gives countenance to the idea that a law may not revive a right to prosecute that which was criminal when done.

Two cases, (one in 25 *Texas* 66, the other in 54 *Miss.*

740,) deny the legislative power, without giving any reason or citing any authority in support of such negation ; they manifestly rest upon the peculiar provisions of their state constitutions. In the former state the constitution forbids any bill of attainder, *ex post facto* law, retroactive law, or any law impairing the obligation of contracts. In the latter state the constitution declares that "no person shall be punished but in virtue of a law established and promulgated prior to the offence and legally applied." *State* v. *Keith,* 63 *N. C.* 140, was an effort to revive punishment after a full amnesty had been granted. The decision was unquestionably right. The state constitution of North Carolina declares retrospective laws to be oppressive, unjust and incompatible with liberty, and it was therefore an attempt to take away a right of immunity which had a constitutional basis.

There is absolute and unvarying uniformity in declaring that the evil intended to be denounced is the imposition of punishment for that which no law punished when it was done, or adding to the punishment then described. An act innocent when done cannot be converted into guilt.

It was this consideration which shocked the sense of justice of our ancestors, and made it impossible under the constitution to enforce laws of this character.

The principle intended to be sanctioned was that there shall be no power in legislation to convert an act, innocent when done, into a crime. It did not embrace all retrospective legislation, so as to inhibit all modifications of law existing at the time of the doing of the criminal act, that might operate to the detriment of the accused.

There is a large class of retrospective laws which have been sanctioned by a long course of adjudication.

The distinction between retrospective and *ex post facto* law has been recognized too long to be now made a subject of controversy.

Mr. Cooley says, (*Const. Lim.* 272,) "But so far as mere modes of procedure are concerned, a party has no more right in a criminal than in a civil action to insist that his case shall

be disposed of under the law in force when the act to be investigated is charged to have taken place. Remedies must always be under the control of the legislature."

Retrospective laws changing the place of trial, or the tribunal before which the accused is tried, or the giving to the state of additional challenges, or authorizing the amendment of indictments, have in repeated instances successfully passed the ordeal of judicial scrutiny. *Gut* v. *State*, 9 *Wall.* 35; *Walston* v. *Commonwealth*, 16 *B. Mon.* 15; *State* v. *Manning*, 14 *Texas* 402; *Commonwealth* v. *Hall*, 97 *Mass.* 570; *Jacquins* v. *Commonwealth*, 9 *Cush.* 279.

Retrospective laws, however unjust, are forbidden to the states by the constitution of the United States only when they impair the obligation of contracts, or, in criminal cases, when they are *ex post facto*.

Through the whole range of discussion upon this subject in the federal courts, there has not been the slightest intimation by any judge that the *ex post facto* clause, so far as it affected crimes, had any wider signification than that given to it in 3 *Dallas*, where the learned judge who pronounced the decision admitted that it had a well-understood technical meaning, and he was careful to express his concurrence in the accuracy of Mr. Blackstone's definition.

In *Suydam* v. *Receivers*, 2 *Green Ch.* 114, decided in 1834, Chancellor Vroom cites with approbation the definition of Chief Justice Marshall in *Fletcher v. Peck*, and says that these words had a technical meaning, and he therefore refused to apply them to the retrospective enactment which gave rise to the controversy in that case.

The *ex post facto* clause was first incorporated in the constitution of this state in 1844, after its meaning had been settled in the federal courts and recognized in our own.

Certainly, neither up to that date, nor since, has any court or any text-writer ventured to give it a wider meaning than that which has been stated.

If anything can be settled, it surely was then settled that an *ex post facto* law must relate to the time the offence was

committed, and make an act innocent when done, criminal, or increase its punishment.

There is no rule of interpretation more inflexibly established than that where language is used after it has received a judicial construction, it must be understood strictly in the sense which the courts had previously given it. Accepting the widest exposition which had been given to this term, it clearly furnished no barrier to the exercise of the legislative authority in this case. The statute in question does not make an act criminal which was innocent when done; it does not aggravate the crime nor inflict a punishment greater than the law annexed to it when committed. In this case there has never been a time when the act for which the defendant was convicted was not a crime of the same grade and amenable to the same punishment before and after the act of 1879; there was simply a time when the right to prosecute was suspended. Nor does this statute alter the mode of proving the offence.

In the recent case of Commonwealth *v.* Duffy, decided in the Supreme Court of Pennsylvania in January, 1881, (2 *Crim. Law Mag.*, March, 1881, p. 230,) it was argued that an extension of the limitation in a criminal case operated as an alteration of the legal rules of evidence, but Judge Green, in delivering the opinion of the court rejected that contention in an argument which seems to be unanswerable. He says:

"The learned court below argues that it would be altering the legal rules of evidence to apply the new bar of five years to a case which was only subject to the bar of two years when committed. The reasoning is, that the commonwealth, in the one case, would be required to prove that the offence was committed within two years, and in the other within five years, and because five years are more than two, the testimony of the commonwealth in the former case is less than in the latter. This argument assumes that there is something more to be proved than the commission of the offence. But it will be seen at once that whether the bar be five years or two years, the proof of the commonwealth is precisely the same in either case. The period of limitation is not a subject of proof at all.

The commonwealth proves that the offence was committed, giving the circumstances in evidence, and necessarily, as a part of the *factum*, the time when committed. If, then, it happens that the law interposes a bar to conviction, if the offence was committed more than two years before the finding of the indictment, and such was the fact in a given case, there can be no conviction. But if the bar were five years, the freedom from conviction would not arise till after five years had elapsed. In each case the actual proof is precisely the same. The commonwealth proves no more and no less in the one case than in the other.

"Hence, both the *quantum* of proof and the rules of evidence are the same in both cases, and there is no change in these respects in changing the time of the bar."

It will be perceived that in the case at bar this objection would apply with equal force to the law if it had been passed before the bar of the previous statute had attached, because it would have permitted the state to introduce evidence of a crime committed more than two years before the finding of the indictment, which the defendant insists is the vice of the act of 1879.

Nor does this act change the punishment by which the crime, before its passage, was denounced.

The punishment is not made contingent, by the statute prescribing it, on the fact that it shall be imposed within two years. The time for prosecution is no part of the punishment, it neither lessens nor increases it; the punishment remains precisely what it was when the crime was committed.

The enlargement of the limitation time adds nothing to the punishment; that is the same, whether inflicted in two years or in five years.

The chance of the culprit's escape altogether from punishment may thereby be somewhat diminished, but the same consequence would flow from an after-law authorizing the offering of large rewards for arrest and conviction, or from a law

requiring the employment of detectives, or from any other law, enforcing greater vigilance on the part of public officials.

All such laws, and many others, which do not suggest themselves, would be equally condemned by this enlarged definition of *ex post facto* law, whether they were passed before or after the bar of the previous statute had attached. It is impossible to foresee the consequences of violating settled rules of interpretation.

In the case in the Pennsylvania Supreme Court, last referred to, neither the counsel nor the court' suggested the idea as worthy of consideration that such enactments increase the punishment.

The cases relied upon to support a reversal, will be found on examination not to cover the point in controversy.

In *Commonwealth* v. *Edwards*, 9 *Dana* 447, there was no law to punish the crime when it was committed, and therefore the legislation of 1838, the validity of which was in issue, was strictly *ex post facto*.

In *Hartung* v. *People*, 26 *N. Y.* 167, the validity of the act of 1861 was controverted. The defendant had, prior to its passage, been convicted of murder, and judgment had been passed upon her; that judgment was carried to the Court of Appeals, and it being there adjudged that there was no law authorizing the punishment of the offence imputed to her, a judgment was pronounced in her favor, which the court said absolved her from being again legally questioned for that charge. The decision of the court was put upon the express ground that the prior adjudication (reported in 22 *N. Y.*) was equivalent to an acquittal, and it was the judgment of a court of competent jurisdiction that, in the then state of the law, she could not be subjected to punishment. Whether this case was well decided is unimportant here, for the reason upon which the conclusion of the court was based makes it of no value as an authority on this issue.

In all the cases on this subject, the definition given by Chief Justice Marshall of an *ex post facto* law is accepted without debate, as the true exposition of the term.

Moore v. State.

In *Jacquins* v. *Commonwealth*, 9 *Cush.* 281, Chief Justice Shaw held that the act of 1851, providing that whenever final judgment in any criminal case was reversed by the Supreme Court, on account of error in the sentence, that court might render such judgment as should have been rendered in the court below, related to writs of error on past as well as future judgments, and that such construction did not make the act *ex post facto*. He accepts the strict technical definition of that term, which has been given in the cases before cited, as the true one; and he then remarks that "the reason why such laws are so universally condemned is that they overlook the great object of all criminal law, which is to hold up the fear and certainty of punishment as a counteracting motive to the minds of persons tempted to crime, to prevent them from committing it. But a punishment prescribed after an act is done cannot, of course, present any such motive. It is contrary to the fundamental principle of criminal justice, which is that the person who violates a law deserves punishment because he wilfully breaks a law which in theory he knows, or may know, to exist. But he cannot know of the existence of a law which does not in fact exist at the time, but is enacted afterwards."

This, which from the days of Lord Coke to the present time has been admitted to be the reason of the rule, does not exist in this case to condemn the law of 1879.

In *Commonwealth* v. *Getchell*, 16 *Pick.* 452, the exercise of the legislative power was sustained and the criminal punished under it, although, as in the present case, there was a period of time during which the offence could not have been punished by any law. So great a judge as Chief Justice Shaw could discover no infirmity in such a law, and he therefore approved this decision in *Commonwealth* v. *Mott*, 21 *Pick.* 492.

If the term *ex post facto* is extended to embrace the present case, the door would be opened to enlarge it indefinitely, to bar all after-legislation which might, in any sense, prove not to be beneficial to the criminal, and thus the prohibitory clause, which had, when adopted, a definite, technical mean-

ing, would cease to be a standard by which to measure the validity of legislative action.

Mr. Bishop, in his work on Statutory Crimes, § 266, says that " a statute authorizing a prosecution after a period of limitation had lapsed, would seem to come within the principle that it pertains not to the right, but to the remedy, and that it does not punish an act innocent when done, or add to the punishment which the law then prescribed."

Such laws must be classified with those that modify criminal procedure, which it is always competent for the legislature to enact.

This law makes no provision as to what shall constitute the crime or be the evidence of it, but simply relates to the mode of procedure for its punishment. The acts constituting the crime, and the proof and punishment of it, had been already declared by statute and common law, and these are in no respect changed, impaired or affected.

3. Is the law faulty within the fourteenth article of the amendments to the federal constitution, which provides that " a state shall not deprive any person of life, liberty or property without due process of law?"

This clause has been interpreted by the federal courts to mean " the due course of legal proceedings according to the rules and forms which have been established for the protection of private rights." *Kennard* v. *Louisiana*, 92 *U. S.* 480.

In that case Chief Justice Waite said that all that was necessary was that provision should be made for trial, for bringing the party before the court, for giving him, an opportunity to be heard in his defence, for the deliberation and judgment of the court, for an appeal to the highest court of the state, and for hearing and judgment there.

None of these rights are denied to the defendant by this law.

4. Did the prior statute of limitations operate as a pardon before conviction to all offences the prosecution of which should become barred by the specified lapse of time?

By the constitution of this state, the pardoning power, after conviction, is vested is the Court of Pardons.

Even conceding to the legislature the right to pardon before conviction, can the statute of limitations existing when the offence was committed be treated as a pardon?

Amnesty and pardon always succeed the commission of the offence. Such a thing as amnesty or pardon before crime committed, or at least imputed, is unknown to the law, and would amount to a license to commit crime.

"A pardon is an act of grace, which exempts the individual on whom it is bestowed from the punishment the law inflicts for a crime he has committed." 7 *Bac. Ab.*, *tit.* "*Pardon.*"

"Extensive as the power of the crown to grant pardon is, it applies only to crimes actually committed; for it is certain that the king can in no way license any act which is in itself unlawful." 1 *Chit. Cr. Law* 765.

The idea, therefore, cannot be entertained that a law passed long prior to the commission of a crime can be invoked by the offender as a pardoning act.

"A pardon, in a legal sense, is a remission of guilt." 1 *Bish. Cr. Law*, § 749.

"It seems agreed that a pardon of treason or felony, even after attainder, so far clears the party from the infamy and all other consequences thereof, that he may have an action against any who shall afterwards call him traitor or felon; for the pardon makes him as it were a new man." 7 *Bac. Ab.*, *tit.* "*Pardon*," H.

In *Cuddington* v. *Wilkins*, *Hob.* 81, the alleged defamatory words published concerning the plaintiff were, "He is a thief." The defendant pleaded that the plaintiff had stolen six sheep. The plaintiff replied that after the felony, and before publication of the words, he had received a general pardon. Upon demurrer, the replication was held to be good, inasmuch as the guilt as well as the punishment is taken away by the pardon.

The effect of the pardon is to make the offender a new

man—to blot out the crime, and leave him not only dispunishable, but as if he had never committed the offence.

No such effect has ever been held to follow the failure to prosecute within the period of limitation; and the insistment that limitation acts operate as a pardon, is wholly without the support of authority. No support for this defence can be found without establishing the proposition that the limitation act was an irrepealable contract between the criminal and the state, that if he violated the law he should not be prosecuted after two years.

Assuming that under any civilized form of government a contract could be made with a criminal to shield him in any way from the consequences of a crime he was about to commit, and giving the limitation law the character of a contract, the necessary and logical inference would be that if the crime was committed upon the faith that the contract would be observed, there would be an estoppel against any change in the law before the expiration of the limited period as well as afterwards.

It would seem to be unnecessary to discuss a proposition so devoid of all merit.

5. The period of limitation under the old law having expired prior to the passage of the act of 1879, did the right to immunity become vested in the defendant so as to be beyond recall by legislation?

It may be well to remark that reflection will not justify the conclusion that the law is one of exceeding severity and injustice. The fact that one who has committed a crime against society is disappointed in his expectation that he is free from prosecution, cannot, in the absence of undue sympathy for the criminal, expose the law to harsh criticism.

Nor does the suggestion that, relying upon the statutory bar, the defendant may have destroyed the evidence which would have clearly vindicated his innocence, add much to the strength of his position.

Constitutional questions cannot be determined by cases of individual hardship. His witness might have died, or his

evidence have been lost by mishap, before the limitation had run. But the true answer is, that every man being presumed to know the law to be that the legislature might, whenever, in their opinion, the exigencies of the state required it, revive the right to prosecute, the loss he sustained by the voluntary destruction of his testimony would be the product of his own incautious act, and not imputable to the severity or injustice of the law. In this view of the case, there is no more harshness in reviving a right to prosecute a past offence than there is in extending the time of limitation to future cases.

Very loose notions are entertained in respect to vested rights. No greater mistake can be committed than to suppose that a large proportion of them are not subject to legislative invasion.

What are vested rights? In the widest sense, they are rights which are complete and consummated, so that nothing remains to be done to fix the right of the citizen to enjoy them. A statutory exemption from the performance of service upon juries or from militia duty, or exemption from taxation, the right to the defence of usury, the right to twenty days' notice of trial, the right to certain time for pleading in the prosecution of suits, and numberless other rights which will suggest themselves, are vested rights equally with the right to the writ of *habeas corpus*, the right to trial by jury and the right of private property.

Yet in the entire category of rights which are complete and vested in the person, there are but two classes for which immunity against the encroachment of the law-maker can be claimed. The first class are those expressly protected by constitutional provisions, either federal or state, such as the right of trial by jury, the privilege of the writ of *habeas corpus*, the right to be secure against unreasonable searches, and protection against cruel and unusual punishments.

The other class is not expressly shielded by the fundamental law, and is, I think, limited to two or three instances.

These are, the title to private property, the incompetency

of the legislature to pass a law denying to a man notice, actual or constructive, of a suit against him or a right to be heard therein, and the principle that a man shall not be made a judge in his own case.

These rights rest upon clear implications from constitutional clauses, strengthened by the fact that they are of such fundamental character that they are deemed essential to the existence of society, and therefore underlie the organic law itself.

Even the want of legislative power in the latter case has been denied by eminent judges, and it must be conceded that courts which have affirmed that the legislature cannot make a man a judge in his own case, have gone to the very verge of their right to put a check upon a co-ordinate branch of government.

When we come into the region of implied restraint upon the law-making power, we are manifestly treading upon dangerous ground.

It is well known that a grave doubt was entertained in the early history of our jurisprudence, whether the courts could pronounce legislative acts void because contrary to express provisions of the constitution. The question is elaborately discussed in the *Federalist*, and it was not set at rest until it received the lucid exposition of the great mind of Chief Justice Marshall, in *Marbury* v. *Madison*, 1 *Cranch* 137. Since that time, courts, with unvarying uniformity, have established the rule that legislative enactments will be declared void only in cases where they are clearly in conflict with the paramount law; to be in doubt is to be resolved in favor of the declaration of the legislative will. When we go outside of those vested rights expressly reserved and guarded in the constitution, it will be found that the exceptional cases mentioned can be rested upon some stable foundation—that there is clear recognition of them in the organic law itself. The doctrine that the law-maker cannot destroy the title to private property—that he cannot take the property of one person and give it to another—is not expressed in the constitu-

tion, but it may be fairly inferred from the clause forbidding the taking of private property, even for public use, without just compensation, and from that which declares that no law shall be passed impairing the obligation of contracts.

That a man cannot, by statute, be denied notice of suit or a hearing in his defence, results from the self-evident proposition that the legislature cannot destroy the other branches of the government without destroying the constitution. The courts provided by the constitution are indestructible. A court is a place where trial takes place and judicial judgment is to be exercised—acts which will be impossible where parties whose rights are to be settled are refused a hearing. By such laws, courts, in the constitutional sense, would be as effectually destroyed as if expressly abolished. No one would dignify a tribunal with such a procedure with the name of a court. The rule that a man shall not be made a judge in his own case cannot be so clearly implied from anything written in the constitution. Considering the frailty of our nature, it is conceded that man is absolutely disqualified and incapable of exercising the judicial function where he is himself a party to the suit; and the practical effect of such legislation would be, to the extent to which the abuse might be carried, the destruction of a co-ordinate branch of the government, by the denial to the citizen of what, in substance and reality, could be termed a judicial trial.

These principles are fundamental, and of such transcendent importance in the structure of government that when they cease to be recognized and enforced, disorder, confusion, violence and anarchy will usurp the place of law and order.

What other vested rights not specified in the constitution can be placed upon the same plane with these?

Can the one now under consideration, for which we must look in vain for any express protection in that instrument?

The defendant, prior to the passage of the act of 1879, had a right to set up, in defence to a criminal prosecution, the statute of limitations in bar, as the law then stood. It was a right vested in him in the same way that the prisoner, in

some cases, has a right to be served with a copy of the panel of jurors. It was a right given by statute law, and for which no requirement is found in the constitution. It is not one of the natural and inalienable rights of man not to be punished for his crimes after the lapse of two years. In the absence of statutory provisions, there is no limitation of the time within which the state may enforce the sanctions of its violated law. There is no limit of time in this state within which murder may be prosecuted.

The right to set up this defence never existed until the law-maker provided it, and it cannot, with any propriety, be classed with the natural rights of man. It was a rule of criminal procedure declared by the legislature, conferring a privilege upon the defendant to which he had no natural right or even the slightest claim.

The law recognized no inherent right in the criminal, but was simply a declaration by the law-giver that public policy and the necessities of state did not, at that time, require the prosecution of the offender after two years.

What natural right to his liberty can a man have who has committed a crime against the laws of society? Clearly, none, if the state may for such crime lawfully deprive him of his freedom.

The limitation was established by the law-maker under the idea that it was a politic measure; but if a subsequent legislature deemed it necessary for the interest of society to abrogate the law and expose the offender to a just punishment for his crime, it is impossible to conceive that such after-legislation can be challenged as an encroachment upon natural, inalienable rights.

The legislative act must be prohibited in terms, or it must be so manifestly contrary to foundation principles that it can, by implication, be clearly brought within the operation of some express inhibitory language of the organic law; otherwise, the law giving a right to the defence is subject, as all other like laws are, to the accepted rule that it did not derogate from the power of a subsequent legislature to annul it.

The statute gave the right; and the right, resting on the statute, must fall with its repeal. This is true of every right arising by statute and claimed as against the state itself, except those which are maintained upon the doctrine of irrepealable contract with the state. *Bloomer* v. *Stolley*, 5 *McLean* 161.

Those who are familiar with the struggle by which this doctrine of irrepealable contracts with the state, in respect to property rights, obtained so firm a foothold in the law, and with the doubts still entertained as to the soundness of that doctrine, will hesitate long before extending it to the new field of the criminal law, in order to favor the criminal classes.

The attempt by a legislature to shackle its successor was treated with deserved contempt by Cicero. In his letters to Atticus he says : " When you repeal the law itself, you at the same time repeal the prohibitory clause which guards against such repeal."

The difference between the abrogation of the act of 1879 and the repeal of limitations upon civil suits is so striking that it cannot escape observation. Upon the implications which arise, by a long line of adjudications, both in England and in this country, from the lapse of time in civil suits, such as the presumption of payment, the existence of a grant or contract between the parties, titles are built up and property rights are established, which, upon the principles already stated, have been held to be defensible against any attack of legislation.

The legislature may at will repeal all such limitation acts ; but when they come to be applied to individual cases, where the limit had expired, titles and property rights acquired and vested under them, as between citizens, before the repeal, are invulnerable. Such rights survive, as individual property, when the law dies.

The incompetency of the legislature to affect the citizen by the repeal of a limitation act upon suits or contracts, does not rest upon the ground that the statute of limitation is presumed to have entered into the contract and to have become part of

it, for that would prevent an enlargement of the time of limitation before the bar attached; but it is founded upon the fact that, by the lapse of time, property rights are acquired.

A right of action is a property right which may be sold and assigned. Therefore, after the bar has attached, an act of legislation which revives the right to sue, is an act to vest property in one at the expense of another. A statute giving or taking away a right of action, gives or takes away property. That was the case of Ryder v. Wilson's Ex'rs, in our own courts. 12 *Vroom* 9.

That the period of limitation in actions of contract may be diminished or enlarged before the bar has attached, is well settled. *Butler* v. *Palmer*, 1 *Hill* 324; *Berry* v. *Ransdall*, 4 *Metc.* (*Ky.*) 292; *Call* v. *Hagger*, 8 *Mass.* 423.

Whether the legislature can repeal the statute of limitations in a civil suit for tort, as for assault and battery, after the bar has attached, is not so clear.

It can be confidently asserted that such power exists, unless there arises a clear implication from some express clause in the constitution forbidding it. Such implication must rest, if it can be recognized, in the fact that it will, in effect, take money which, by the expiration of the statutory limit of time, the defendant had a complete right to retain, and give it to the plaintiff, thus taking the property of one and giving it to another.

The legislative authority was fully maintained in the New York Supreme Court, where it is said: "There is no inhibition in the constitution against depriving a person of a cause of action originating in a naked tort. Though the legislature may not pass a law impairing the obligation of contracts, it unquestionably has power to pass a statute which shall act retrospectively, and sweep away any right of action that arose from a tort." *Guillotel* v. *Mayor*, 55 *How. Pr.* 114.

The contrary rule was announced in *Girdner* v. *Stephens*, 1 *Heisk.* 280, on the theory that it deprived a party of a prop-

Moore v. State.

erty right; but these retrospective laws are prohibited by the state constitution.

A punishment by fine for crime, after the bar had attached, would not be subject to the objection that it was taking the property of the offender for public use without compensation, for the fine is imposed by way of punishment, to deter the offender, and not as a fiscal measure for public use.

In exposing the criminal to such punishment, property vested in him is always taken and put in the public treasury. A fine, therefore, could never be imposed if it was regarded as the taking of private property for public use, without giving back to the criminal as much as was taken from him.

There being an entire absence of any expression in the constitution to support the contention of the defendant that the right to the defence of the statute of limitations cannot be impaired, he must maintain his position upon general principles.

What is there in this deprivation of which the defendant complains, which disturbs or unsettles foundation principles?

The legislative branch of the government will be absolutely prostrated before the courts if the law can be pronounced unconstitutional because its apparent harshness shocks our sense of justice. It is the prerogative of the law-making power to determine whether it will be wise or just to pass a given law. Within that sphere the legislative discretion is absolute, and if harsh or burdensome laws are enacted, the remedy, under our system, is by an appeal to a subsequent legislature, and not to the courts.

Courts must accord to co-ordinate branches of the government the same credit for wisdom and integrity, in the execution of their prescribed functions, that they claim in the exercise of their own.

What is there in the withdrawal, from one who has committed a crime against society, of the right to set up the statutory bar of limitation, which will justify courts in declaring with any confidence that it cannot be done?

No one, I think, will assert that the preservation and continuation of such a right is comparable in importance to the

state or to its citizens with the right of trial by jury, the privilege of the writ of *habeas corpus*, the exemption from cruel punishments and illegal searches, or the right of freedom from a second trial after acquittal. Yet, each and all of these vested rights, if not entrenched in the organic law, but arising only by statute, it cannot be doubted, might be swept away at the legislative will. They are beyond the reach of hostile legislation, not because they are vested rights, but for the reason that they are rights guaranteed by a law which is higher than the law-maker.

Something more, then, must be done than to conclude that the defendant had by the lapse of the limitation a vested right to immunity, to justify the court in interposing between the law and the prisoner who has violated it; it must be shown that the vested right has a basis in the constitution itself, either by expression or by clear implication. Not only is there an entire absence of any such sanction for it, but the most diligent search which I have been able to give the subject has failed to find even a suggestion, by any text-writer, or in any judicial opinion, that the doctrine of vested rights has any existence in the law except in its application to property.

It may be that the right of the defendant, prior to the passage of the act of 1879, to set up the statute of limitations, is of such importance that it ought to have been unassailable, but the framers of our constitution having failed to put this restriction upon the legislature, the courts cannot do it, without in effect assuming to amend the constitution, to make it conform with judicial ideas of what it ought to be.

Those who constructed this foundation for our state government to rest upon, after implanting in so many wise checks upon the power of the legislature, manifested a most remarkable confidence in the wisdom of the judiciary, if it was intended to bestow upon the courts the power, without any limitation whatever, to pronounce a law void because, in the judicial eye, it was an encroachment upon some right of man.

In Calder *v.* Bull, in order to show that the term *ex post*

*facto* did not apply to contracts, Judge Chase used this forcible argument.

"Where is the necessity or use of the latter words ('impairing the obligation of contracts') if a law impairing the obligation of contracts be comprehended within the terms *ex post facto* law? It is obvious from the specification of contracts in the last member of the clause that the framers of the constitution did not understand or use the words in the sense contended for on the part of the plaintiff in error. They understood and used the words in their known and appropriate signification, as referring to crimes, pains and penalties and no further."

Adapting this argument to the present contention, it may with equal force be asked, why was the *ex post facto* clause engrafted upon the constitution, if the rights which the criminal may at any time have under existing laws, were deemed to be vested rights, entitled to the same protection accorded to vested rights of property?

It is obvious that it was never supposed that such a principle could be invoked to support immunity for crime.

Article I., paragraph 1, of our state constitution of 1844, which promulgates the natural and inalienable right of enjoying and defending life and liberty, and of pursuing and obtaining safety and happiness, cannot be successfully invoked in aid of this defence.

The rights intended to be comprehended in this declaration are older than human institutions, and such as spring from eternal justice; they cannot be such rights as have their origin in statute law.

The framers of that instrument, after the experience of three-quarters of a century of constitutional government, with all the wisdom and warnings of the past to guide them, did not execute their work so crudely as to leave it to uncertain implication, from language which had no settled, definite signification, to ascertain what was embraced in this declaration of immutable principles. They securely imbedded in the organic law, the checks and limitations, which they deemed

essential for the uninterrupted enjoyment of these rights in themselves, and for the safe transmission of them to their posterity.

The right of the people to alter or reform the government, the rights of conscience, the liberty of speech, security against unreasonable searches, the trial by jury, the *habeas corpus*, a speedy trial in criminal cases, freedom from a second trial: after acquittal, the protection of private property, the obligation of contracts, the preservation of remedies, the *ex post facto* clause, and other rights were carefully enumerated, and perpetuated by express guaranties.

If we open wide the door of implication, the judiciary may repress all legislation which they deem inimical to the liberty or happiness of men ; a power immeasurably greater than that entrusted to the governor in the veto.

In what shall the natural and inalienable rights of man to the enjoyment and defence of liberty, and to the pursuit and obtaining of happiness and safety be deemed to consist ?

Shall we adopt the views proclaimed by the French assembly of 1789, or the doctrines of the socialists or communists ?

Shall we accept the opinions of the advanced minds of our own country as the true theory of human rights, or shall we be influenced by the more conservative thought and sentiment ?

Are liberty and the pursuit of happiness illegally restrained by marriage laws, or by laws forbidding the exercise of certain trades and employments, or by those enforcing the observance of the Sabbath ?

Who shall erect the standard by which these controverted questions are ultimately to be adjudged ?

These matters are referred to, to illustrate the folly of enunciating the doctrine that there is a wide field in which a great variety of view, prevails, where the limitation on the power of legislation would exist, not in the written constitution itself, but in the breast of the judge, and would thus be subject to change, and fluctuate according to the notions which

might be entertained by successive incumbents of the judicial office.

When we go outside of the express limitations of the constitution, we enter a domain of uncertainty, which a judicious mind cannot approach with feelings other than of extreme caution and profound distrust.

The cases in which legislative acts can be declared unconstitutional by the judiciary, where there is no express inhibition, must be within an exceedingly narrow compass, and are restricted to those instances where the implication can be clearly drawn from powers expressly withheld, and to laws which attempt to derogate from the power of subsequent legislatures, or which tend to destroy or impair the rights of co-ordinate branches of the government.

In my judgment, it is impossible, upon sound principle, to overstep this boundary.

The doctrine of implication from this general assertion of rights, if applied to this case, must rest upon the false assumption that nothing which concerns or affects the liberty of the citizen is left to legislative discretion.

To denounce the action of the legislature upon such an idea, which is without the support of an adjudicated case, would be an assumption of judicial power far more detrimental to the interests of the state, by reason of the uncertainty it would create, under our system of government, than any evils which can flow from the enactment which has given rise to this discussion.

The natural right of man to liberty is not controverted in this case; it is recognized and securely protected by the letter of the constitution, and needs no implication to support it. We are dealing here with man as a law-breaker. In organized society, as against the sovereign, the offending citizen can set up no natural right to retain his property or his liberty, so far as the sovereign may see fit to deprive him of either for his crime. It has not been shown how any indefeasible right has been gained by the defendant as against the sovereign by lapse of time. In civil actions, by lapse of limitation time,

citizens, as has been shown, acquire rights as against each other, which are property rights as between themselves, and therefore are as indestructible as other property, but they thereby acquire no rights as against the state. The law may be repealed at will, but whatever has become, as between individuals, private property, retains its character as private property after the repeal and without further support of the law through which it arose, and necessarily ranks with all other private property. The distinction is between rights acquired under legislation which become private property as between citizens, and rights attempted to be set up by the citizen against the state. As to the latter rights, it is immaterial whether, while they exist, they are of the character of property rights, as in case of franchises granted by legislative enactment, or such rights as defendant may have under laws relating to criminal proceedings, of which the right now set up by defendant is an instance. In such cases the individual enjoys something as against and by the favor of the sovereign expressed through a statute, having its life in and co-existent with the statute, and subject, in its very nature and essence, to the power of a subsequent legislature to annul it in the absence of constitutional inhibition. The franchise granted by one legislature, though a vested right of property, can unquestionably be taken away by a subsequent legislature, except only in those cases where the grantee is in a position to shield himself under the doctrine of irrepealable contract. The statute gave and the statute can take away. This rule must apply with equal force to all rights which a defendant may enjoy as against the sovereign under statutes regulating criminal proceedings. Unless they are protected by the *ex post facto* clause, they can be no more sacred than the law itself in and by which they live, which is repealable at will. Upon what ground can such rights be held to be indefeasible, which will not apply with equal force to the grant of a franchise where there is no contract to bind the state, or to the grant of a remedy? Citizens gain no right as against each other to a particular remedy, (in the absence of constitutional provisions

prohibiting its impairment,) because remedies are part of the general policy of the state, and not the subject of property between individuals.  Therefore, as the law recognizes no capacity in the citizen to acquire, as against the state, an indefeasible right to use the remedy, the legislature may at any time withdraw it.

The right to liberty is one thing; the right which the defendant would have had to set up the limitation bar if he had been prosecuted at some former time, is another and very different thing.  He must show an indefeasible right as against the state to set up such bar before he can derive from it any right to liberty.  The assertion of a right to liberty is mere assumption of that which he is bound to prove.

In *Butler* v. *Palmer*, 1 *Hill* 329, Judge Cowen says: "Strong expressions may be found in the books against legislative interference with vested rights; but it is inconceivable, that after allowing the few restrictions to be found in the federal and state constitutions, any farther bounds can be set to legislative power by written prescription.  Every right resting in perfect obligation is vested ; and such a right being conferred by statute, renders it no more sacred than if it were sanctioned merely by the law of nature or the common law.  A state statute granting a gratuitous pension was repealed before any payment was made under it, and a very learned court agreed unanimously that if the grant did not amount to a contract the pension was gone."

In the case in 9 *Cush.* 281, the vested right which the defendant in a criminal case had, when he brought his writ of error, to a reversal of the judgment against him as the law then stood, was taken away by after-legislation ; and in our own state a vested right to twelve per cent. interest by way of penalty may be swept away by the law-maker, even after suit brought.  *Town of Belvidere* v. *Warren R. R.*, 5 *Vroom* 193.

Being unable to find anything in either the state or federal constitution which expressly or by implication prohibits the

passage of this law, I shall vote to affirm the judgment below.

At the instance of three members of the court, the following questions were put, and they were decided as follows:

1. Does the act of March 14th, 1879, apply to offences as to which, at the time of its passage, the statute of limitations had completely run?

*Affirmative*—THE CHANCELLOR, DEPUE, MAGIE, REED, VAN SYCKEL, CLEMENT, DODD, GREEN.

*Negative*—DIXON, KNAPP, PARKER.

2. Adopting this construction, is the act so far unconstitutional, as an *ex post facto* law?

*Affirmative*—THE CHANCELLOR, DIXON, KNAPP, PARKER, REED, DODD.

*Negative*—DEPUE, MAGIE, VAN SYCKEL, CLEMENT, GREEN.

3. Adopting the same construction, is the act *pro tanto* invalid, as being in conflict with vested rights?

*Affirmative*—THE CHANCELLOR, DIXON, KNAPP, MAGIE, PARKER, REED, DODD.

*Negative*—DEPUE, VAN SYCKEL, CLEMENT, GREEN.

4. Shall the judgment below be reversed?

*Affirmative*—THE CHANCELLOR, DIXON, KNAPP, MAGIE, PARKER, REED, DODD.

*Negative*—DEPUE, VAN SYCKEL, CLEMENT, GREEN.